Theodore NOLEN, Jr., Plaintiff,

v.

UNITED STATES of America, Defendant.

Civ. A. No. 79–137.

United States District Court, W.D. Pennsylvania.

Sept. 7, 1983.

Thomas L. Cooper, James A. Dattilo, Pittsburgh, Pa., for plaintiff.

Craig R. McKay, Asst. U.S. Atty., Pittsburgh, Pa., for defendant.

## OPINION

ROSENBERG, District Judge.

This matter is before me by virtue of the Federal Tort Claims Act, 28 U.S.C. § 1346(b), § 2671 et seq. The plaintiff, Theodore Nolen, Jr., brought this action for damages because of the alleged medical negligence of the doctors of the Veterans Administration (VA). The plaintiff claims that on numerous occasions, while being treated at the Veterans Administration medical facilities, the doctors failed to properly test, diagnose and treat his condition, resulting in great physical and psychological damages. Jurisdiction is conferred upon this court by 28 U.S.C. § 1357.

The plaintiff is 54 years of age, married, with 6 children. He had worked at various manual labor jobs since he left school after the eighth grade. In May or June of 1970, he was working at his last job with a brick company when his physical problems began. He first complained of back pains, loss of weight, headaches and swelling of the feet and ankles. After he failed to improve under the care of his family physician, Dr. Charles Zimmerman, Nolen was referred, as a veteran, to the VA hospital in Pittsburgh, Pennsylvania. He first visited there for tests on July 9, 1970. He returned for further testing on July 29 and was admitted as a patient on August 30. He was released on September 4. During this time the plaintiff was examined by Dr. Robert Vincent and Dr. Charles Kalko of the VA Hospital. Both ordered myelograms performed. These tests are diagnostic. Contrast (pantopaque) material is infused into the spinal column, and as the dye within the spinal cavity is viewed by the examiner, evidence of possible obstructions or tumors become visible. Because some of the dye escaped the test area on August 25, a myelogram was repeated on September 1. This myelogram, performed with the plaintiff in a prone position, was found to be normal.

The plaintiff contends that testing in a prone position was medical error, especially when the first (incomplete) test had indicated a suspicious mass. He asserts that he should have been placed in a supine or lateral decubitus [1] position for the September 1 myelogram in order to reveal possible lateral lesions in the thoracic region. The plaintiff also contends that the physicians

---

1. In a supine position the body would be lying face upward. In a lateral decubitus position the body would be lying on its side.

at the VA hospital were negligent in not performing a Queckenstedt test or tests[2] on the cerebrospinal fluid to determine if he had a spinal cord tumor, or whether his problems were caused by multiple sclerosis as the doctors had suspected.

Dr. Kalko, a resident physician at the VA hospital, had scheduled Nolen for exploratory surgery after the first myelogram, in order to determine whether a spinal cord tumor was present. However, the senior VA physicians cancelled this surgery, which was not subsequently rescheduled, because the second myelogram was "normal".

Based upon the tests conducted, Dr. Vincent concluded that Nolen was a "suspected multiple sclerosis patient". The plaintiff was released and notified to return for a follow-up examination in six weeks, or sooner if new symptoms were to arise. Nolen was admitted again to the VA hospital on September 14 and discharged on September 27. During this time tests were ordered by Dr. Kalko. They included brain scans and a cerotid angiogram. The results of these tests were negative and the plaintiff was discharged, again with the diagnosis of most probable multiple sclerosis.

The plaintiff was then admitted to the Presbyterian University Hospital for 13 days beginning on November 7. He was afterwards admitted three additional times in January, March and April, 1971. Dr. Joseph Delaney, a physician associated with the VA hospital stated that he formed the impression during the plaintiff's visits to this hospital that Nolen was suffering from "possible late onset Multiple Sclerosis". A ten-day course of the drug ATCH was prescribed. This apparently did not improve the plaintiff's condition. Again, the plaintiff criticizes the tests, or lack of tests, which failed to investigate the possibility of a spinal cord tumor as being responsible for his condition.

From 1970 to 1972 the plaintiff's condition continued to deteriorate. Despite multiple hospital admissions and tests, Nolen progressively lost his ability to walk, and to control his bowel and bladder functions. The plaintiff became a functional paraplegic[3] sometime in December 1970, and was compelled to use a wheelchair to move about. During these hospital admissions, Nolen was treated for numerous urinary tract infections and for decubitus ulcers which were caused by his immobility. Upon each discharge, the diagnosis was almost uniformly that the plaintiff was suffering from "multiple sclerosis".

The first divergence from this view (other than the initial opinion of the VA resident, Dr. Kalko), came from a preliminary opinion of Dr. Robert Baker after the plaintiff was admitted to Shadyside Hospital in December, 1972. Dr. Baker ordered further myelography when he suspected that the plaintiff might have a primary cord lesion, which could have been responsible for his symptoms. The plaintiff then underwent his third myelogram examination in December, 1972, two years and three months after his second myelogram at the VA hospital. This time views were obtained from other than in the prone position, and what were described as arachnoid cysts were found in the thoracic and cervical areas. However, after these tests were completed both Dr. Baker and Nolen's family physician, Dr. Zimmerman, stated the opinion: "That there was no operative lesion here and the arachnoid cyst did not explain his complaint". (Def. Ex. J). Nolen was then discharged with the diagnosis of "multiple sclerosis".

Almost one year later, Nolen was again admitted to the VA hospital for the purpose of treating his decubitus ulcers and a urinary tract infection. Approximately four weeks later, he was discharged, again with a primary diagnosis of "multiple sclerosis".

The plaintiff returned to the VA hospital from June 13 through July 12, 1974. During this visit Nolen's fourth myelogram

2. The Queckenstedt test monitors the pressure of the cerebrospinal fluid to determine if there is a block in the vertebral canal.

3. The plaintiff's condition was such that he could not use his legs and lower extremities, but it was not one of total paralysis.

study was performed on June 18, where different views (bilateral decubitus) were again obtained. The results of these tests indicated the presence of what were described as arachnoid cysts at spinal area designations "T–1 and T–2 levels". Dr. Eric Holm scheduled the plaintiff for surgery, a "laminectomy", to be performed on June 28. Prior to this operation, Dr. Holm explained to the plaintiff that he might benefit from the removal of these masses, although if he did indeed have multiple sclerosis, this condition would not be alleviated. (Osgood Dep. 38–39).

During the surgery by Dr. Holm, four masses were noted in the dura, which is the tissue surrounding the spinal cord. Three small masses were present, along with the largest mass which was described as a "granuloma",[4] anterior to the T–2 nerve root. It measured 1cm. × 5.5cm. × .3cm. (Tr. 355). Significantly Dr. Holm testified that this granuloma was not compressing the spinal cord, and that the spinal cord was not deviated.[5] (Tr. 350–351). This testimony was not contradicted by any evidence. I, therefore, find as a fact that the masses found by the surgeon did not compress or deviate the spinal cord, as I shall discuss presently.

The plaintiff contends that his condition improved following the operation, and that there would have been greater improvement had the surgery been performed at an earlier time. The evidence indicates that any improvement was transitory and marginal at best. (See Def. Ex. L). Dr. Holm attributed any improvement in Nolen's abilities, to a course of steroids which he was given. Steroids are medications used to reduce swelling in nerve tissue or to prevent swelling following trauma (such as surgery). They are also used in the treatment of multiple sclerosis. (Tr. 358–359).

Dr. Holm discharged the plaintiff on July 12 with the diagnosis that a granuloma had been present, and that multiple sclerosis was probable. In December of the same year, Nolen received rehabilitation treatment at the VA hospital, and was also treated for decubitus ulcers and for bladder infection.

The plaintiff places heavy reliance on a letter from Dr. Carroll Osgood of the VA hospital to Dr. Rex Newton of the Harmarville Rehabilitation Center, requesting follow-up rehabilitation efforts for Nolen. The letter emphasizes the significance of the granuloma and its removal, noting that after the operation, the plaintiff was able to flex his ankles, whereas before surgery he was only able to move his toes. In addition, Dr. Osgood noted improvement in sensation and a decrease in spasticity.[6]

Following his discharge from the VA hospital in December, Nolen was admitted to Harmarville for treatment on August 8 and remained there until September 17, 1975. Dr. Louis Katz, a VA physiatrist practicing at Harmarville, testified that after only a few days of rehabilitation therapy, Nolen insisted upon leaving, because the rehabilitation process would be tedious (with little expectation of significant improvement).

Subsequent to his discharge from Harmarville, Nolen was treated in Braddock Hospital in 1976, Shadyside Hospital in 1978, Mercy Hospital in 1979, and the VA hospital in 1982. All these hospitalizations were undertaken for the purpose of treating the ulcers and bladder infections which the plaintiff incurred periodically.

At the present time, the plaintiff has paraplegia which renders his lower extremities immobile, and in constant pain, along with the presence of frequent spasms. He is unable to move about except with the aid of others and of a wheelchair and he must spend approximately 75 percent of his time in bed. The plaintiff has no capable physi-

4. A granuloma is a small nodular inflammatory lesion.

5. Compression or deviation of the spinal cord would be an indication of impairment of neurological function.

6. Spasticity is a state of increased muscular tone with exaggeration of the tendon reflexes.

cal functioning below his waist and lacks control over his bowels and bladder.

He urinates through a catheter that collects the material externally in a bag which must be emptied by attendants. In addition, as previously outlined, the plaintiff suffers from numerous urinary infections. Because of being bedridden, he has become afflicted with deep bed sores or decubitus ulcers. They are constantly treated by the plaintiff's wife. The bladder and bowel disfunctions are, from the evidence, indicated as being a result of multiple sclerosis. He must be helped in and out of bed and the wheelchair, except for overhead bars which the plaintiff is capable of using with his arms. He also needs to be helped into and out of automobiles from and to his wheelchair, when transported outdoors.

An abundance of expert testimony was presented which I evaluated on the basis of objective foundation and credibility in order to make findings of ultimate fact. The basic issue was whether the plaintiff has or had multiple sclerosis. If the plaintiff did have MS at the time of the first myelogram in August, 1970, then there was no "erroneous diagnosis" by the VA physicians as the plaintiff is contending.

The plaintiff supports his contentions by the testimony of Dr. Katz of the Harmarville Rehabilitation Center for the purpose of showing that Nolen's paraplegia was due to a spinal cord tumor. However, Dr. Katz emphasized repeatedly that he was a physiatrist and said "I don't have anything to say about the diagnosis, because I'm not a neurologist, nor am I a neurosurgeon". (Tr. 160–161). Dr. Katz went on to explain that his treatment of Nolen would have been the same no matter what the cause of paraplegia. Dr. Katz testified that Nolen's difficulties with respect to his bowels, bladder, urinary tract, contractures, bed sores and scissoring[7] were consistent with the problems of other multiple sclerosis patients. (Tr. 156–157).

Dr. Kalko, one of the original VA physicians who examined Nolen, also testified on behalf of the plaintiff. He stated that his opinion in 1970 was that Nolen had a potentially treatable lesion of the upper thoracic region.

Dr. Eugene Samuelson, a neurosurgeon, an expert, was employed by the plaintiff. He testified by way of videotape deposition. The plaintiff was hospitalized at St. John's Hospital, upon the referral of counsel, in November, 1977. During this time, Dr. Samuelson performed "CAT Scans" on Nolen, a new test which was not available at the time of the onset of the plaintiff's condition. A CAT Scan, as Dr. Ludwig Guttman later explained, is obtained by an x-ray machine which can take soft shadows, indistinguishable by the human eye, magnify them by the use of a computer, and make many of the brain's structures visible. (Tr. 267). Dr. Samuelson believed that the CAT Scanning he performed did not show the plaques or scars usually present with MS patients (however, another expert did find manifestations of MS in those CAT Scans, infra). He also testified that in his medical opinion Nolen did not have multiple sclerosis, and that the myelographic procedure performed on the plaintiff at the VA hospital in 1970 was inadequate and did not conform to acceptable medical practice at the time. (Dep. Samuelson, 27–32).

The plaintiff's case was concluded with the videotape deposition of Dr. Carroll Osgood, who was a VA physician and the acting chief of the neurosurgical service at the VA hospital in 1974. He testified that he did not have an opinion with a high degree of certainty as to the cause of the plaintiff's paraplegia. Even though there was a small mass there, it is a possibility that this granuloma caused his paraplegia, and he added: "but it is possible that Mr. Nolen has some type of demyelinating disorder affecting his thoracic cord, such as multiple sclerosis." (Osgood, Dep. 16). Under cross examination, Dr. Osgood stated

7. Dr. Katz testified that the plaintiff's legs were scissoring when they went towards each other and it was difficult to separate them. (Tr. 146).

that it is "very possible that Mr. Nolen has multiple sclerosis". (Osgood, Dep. 52).

All the testimony upon which the plaintiff relies is effectively contradicted, neutralized or completely negated by the evidence of the eminent and highly lucid specialists who testified on behalf of the government in this case.

The matter of credibility is one which this court is required to weigh heavily. The medical facts presented by the government's experts was such as had to be compared and contrasted with the plaintiff's evidence in order to arrive at these findings of fact. In this connection it is important to emphasize that the evidence conclusively established that the spinal cord was not blocked or deviated, and that there were no obstructions which could have had the effect of producing the harm of which the plaintiff complains.

Dr. Ludwig Guttman was an expert who testified on behalf of the defendant. Dr. Guttman is a professor and chairman of the Department of Neurology for the West Virginia University Medical School since 1970. He has written a considerable number of articles for publication in medical journals, including several on the subject of multiple sclerosis.

Dr. Guttman, having examined the plaintiff and reviewed the medical records in the case including the results of tests which he conducted, testified that multiple sclerosis is an unfortunately common disease in the practice of neurology. The disease generally afflicts people between the ages of 17 and 40, but may begin as late as the 60's. Multiple sclerosis affects the white matter of the nervous system, which is the fiber tracts inter-connecting the various areas of the central nervous system. It produces lesions in the white matter, and breaks down the myelin, or insulation of the nerve fibers.

Significantly, with regard to the instant case, while in many patients MS produces lesions throughout the nervous system, in other cases the disease is largely limited to the spinal cord, and this is known as the spinal form of MS. While most MS patients do not have a steady downhill course, in that they have periods of recovery after periods of decline (known as exacerbations and remissions), the spinal form of MS is often progressive, or in other words, downhill without periods of recovery, such as in the case of the plaintiff.

Unfortunately, there is no cure for MS. There are certain drugs like ACTH, Thorzine or Corticoids, which help some patients; however, there are significant numbers of MS patients who do not respond to these. Dr. Guttman testified also that although the optic nerves are one of the favorite sites of MS involvement, probably 30 to 40 percent of the patients he treats never have evidence of optic nerve dysfunction.

Based on all of the evidence, examinations, tests and reports, Dr. Guttman stated that in his opinion, within a reasonable degree of medical certainty, "by far and away the most likely diagnosis in this man is the spinal form of multiple sclerosis". (Tr. 219). Dr. Guttman pointed out that there is no certain test for MS that can be done on a living patient, but that the diagnosis involves ruling out other causes.

In the opinion of Dr. Guttman, it is not medical error for the first two myelograms performed at the VA hospital to have been done in the prone position. Most myelograms performed at the West Virginia Medical Center are done only in the prone position. Dr. Guttman explained that a myelogram is an uncomfortable procedure where dye is injected into the spinal canal while the patient is left hanging in a pair of boots with a needle in his back. From a practical point of view, all information can be obtained from a myelogram by doing it in the prone position, especially since the radiologist who is doing the myelogram can watch the dye flow up and down the canal as he changes the position of the patient, in order to scrutinize areas where there may be an obstruction. (Tr. 225–231).

Dr. Guttman described the granulomas found in the 1974 operation as "panopaque granulomas", which are "little nodules of

inflammation" caused by the dye used in the first myelograms. (Tr. 223–234).

Subsequently, Dr. Benjamin Eidelman confirmed that the dye or contrast agent used in myelograms can cause inflammatory reactions which become granulomas. (Tr. 392–393).

During cross examination, Dr. Guttman examined the CAT Scans taken by the plaintiff's doctor. This advanced diagnostic tool was not available when the plaintiff's condition became serious. It has emerged only recently as an aid in the diagnosis of some cases of MS, particularly during an acute attack of MS. (Tr. 269). Upon examining the CAT Scan pictures, Dr. Guttman testified that suspicious MS lesions may have been present, and that the picture was "quite compatible with a single MS lesion". (Tr. 270–276).

Finally, Dr. Guttman explained that a significant number of MS patients do not respond to ATCH; that the lack of optic nerve damage does not rule out MS; that atrophy was found in the spinal cord above and below the level of the granulomas—indicating a spinal cord disease; that exacerbations and remissions are uncommon in the spinal form of MS; that all the plaintiff's spinal protein levels when taken together were not inconsistent with MS; and that the nerves in the closest proximity to the granuloma had no connection with the lower extremities.

Dr. Eidelman, a neurologist and associate professor of neurology at the University of Pittsburgh Medical School, testified on behalf of the defendant. Dr. Eidelman has written numerous medical articles and is on the Advisory Board of the Western Pennsylvania affiliate of the National Multiple Sclerosis Society. He testified that within a reasonable degree of medical certainty Nolen has the "classic spinal form of multiple sclerosis". (Tr. 377).

The spinal form of MS tends to occur later in life, after age 40. This form of MS follows a progressive downhill course without true remission, which again is the same course as that of the plaintiff. (Tr. 377). Additionally, many of the plaintiff's symptoms, throughout the course of this disease, such as transient ataxia, a brief period when coordination is affected, and bowel and bladder disturbances, are often associated with MS.

The operation performed on the plaintiff in 1974 removed a mass anterior to the T–2 root. According to the plaintiff's theory, this operation should have been performed in 1970, which might then have prevented his paralysis. However, all the evidence indicates that the nerves in this area control functions above the waist and have nothing whatsoever to do with the ability to walk or to control the lower extremities. (Tr. 391). Therefore, I conclude that the mass removed in 1974, or its failure of being removed before that time, could not have been the cause of the plaintiff's medical condition.

Dr. Eidelman testified that the Queckenstedt is useful only when there is a complete block, and that it was an old fashioned test devised prior to the myelography and has no clinical importance today. (Tr. 440). According to the doctor, the treatment by the VA physicians from 1970 to 1974 was "appropriate at all times". (Tr. 385). The laminectomy performed in 1974 was done as a "last resort procedure", performed in the hope of identifying a cause undetectable by conventional radiography". (Tr. 386). Furthermore, the mass found in 1974 was one which could have easily been caused by residue material from the myelograms conducted in 1970.

From the credible evidence and expert testimony, I find as a fact that the plaintiff Nolen has now and had in 1970 the spinal form of multiple sclerosis; that there was no erroneous diagnosis on the part of the VA physicians; that the myelograms initially performed on the plaintiff, in the prone position, were adequate according to the accepted standards of that time; that the granulomas or cysts removed in 1974 had no relation or connection with the plaintiff's lower extremity problems; and that the care the plaintiff received from the VA was highly professional and competent in all respects.

■ The Federal Tort Claims Act, 28 U.S.C. § 1346(b) provides that the United States shall be liable "under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred". In order to determine the applicable law, it is necessary to decide "where the act or omission occurred" and then to apply the "whole law" of that jurisdiction. *Richards v. United States,* 369 U.S. 1, 9, 10, 82 S.Ct. 585, 591, 591, 7 L.Ed.2d 492 (1962). Since all of the alleged acts of negligence took place in Pennsylvania, the law of Pennsylvania will apply.

In *McCandless v. McWha,* 22 Pa. 261 (1883), the Supreme Court of Pennsylvania stated that the duty of a physician to a patient, according to his implied contract, "is not to cure ... but to treat the case with diligence and skill". 22 Pa. at 267. The court stated further that the standard of "reasonable skill and diligence" is that which "thoroughly educated surgeons ordinarily employ". 22 Pa. at 268.

As the basis for malpractice actions also became tortious conduct, the Court of Appeals for the Third Circuit reflected the evolution of Pennsylvania law when it said:

"We point out that a person going to a doctor for treatment impliedly contracts with him for treatment and under the law of Pennsylvania if the doctor fails to afford proper treatment and care a malpractice suit sounding in tort can be maintained." *Brown v. Moore,* 247 F.2d 711, 716, C.A.3, 1957.

■ At the present time, malpractice in Pennsylvania consists of a negligent or unskilled performance by a physician of duties which are devolved and incumbent on him on account of his relations with his patients, or of a want of proper care and skill in the performance of a professional act. *Hodgson v. Bigelow,* 335 Pa. 497, 7 A.2d 338 (1939). A physician or surgeon is liable for failure to possess ordinary skill, or to exercise ordinary skill, care and diligence, as a result of which his patient is injured. In addition, a physician is required to give "due regard to the advanced state of the profession and to exercise the care and judgment of a reasonable man in the exercise of medical skill and knowledge". *Incollingo v. Ewing,* 444 Pa. 263, 299, 282 A.2d 206 (1971).

■ Physicians who are specialists must conform to a higher standard which was articulated by the Third Circuit in *McPhee v. Reichel,* 461 F.2d 947, 951, C.A.3, 1972. The Court said, "... a specialist should be held to a higher degree of care than a general practitioner". In the instant case, the VA physicians complained of were neurologists and neurosurgeons, and their conduct must conform to the standard of care of such practicing specialists.

The plaintiff has cited a number of cases which focus on the physician's duty to perform adequate and complete tests, in order to secure a sufficient factual basis upon which to support a diagnosis of judgment. *Smith v. Yohe,* 412 Pa. 94, 100, 194 A.2d 167 (1963); *Hicks v. United States,* 368 F.2d 626, C.A.4, 1966; *Kingston v. McGrath,* 232 F.2d 495, C.A.9, 1956. In two of the above cases the defendants failed to take timely X-rays (or a sufficient number of X-rays) to reveal fractures which were eventually discovered. In these cases it is undisputed that the proper X-ray or other diagnostic procedures were not followed, with the resulting harm of an undiagnosed injury. However, in the instant case, the preponderance of the credible expert testimony indicated overwhelmingly that the myelogram and other tests performed on the plaintiff were adequate in terms of the standards at that time. In fact, although the plaintiff argues that more myelography should have been done, the granuloma removed from the plaintiff was located in an area which was not neurologically related to the plaintiff's dysfunction, as the nerve from T–2 Root controls muscles that are used for breathing, or muscles across a small band running across the chest (Tr. 391), and the mass could have itself been caused by a build-up of excess material from the myelogram itself.

It was demonstrated at trial by expert testimony that the largest mass removed from the plaintiff in 1974 could not have influenced his lower extremities, because of the location of that mass and the fact that it was not compressing the spinal cord. However, in 1970 there was the opinion of one junior resident physician that a spinal cord lesion could have been present. The operation he had scheduled was cancelled by senior physicians pending further tests, which subsequently ruled out the presence of a tumor.

In *Harringan v. United States,* 408 F.Supp. 177 (E.D.Pa.1976), also a suit against VA physicians, Judge Clary stated:

"In Pennsylvania, if a doctor follows one of two lines of thought or belief supported by reputable, respectable, and reasonable medical experts, then he cannot be found negligent. *Tobash v. Jones,* 419 Pa. 205, 213 A.2d 588 (1965). Where doctors in good standing in the community disagree or where medical authorities are divided, the competent physician is only bound to exercise his best judgment in determining which course is on the whole best." (Citing cases).

The diagnosis of MS by the VA physicians is the most reasonable diagnosis at the present time, and certainly was a reputable, respectable and reasonable medical opinion in 1970.

In *Salis v. United States,* 522 F.Supp. 989 (D.C.Pa., 1981), the court held that a litigant may not prevail on a medical malpractice theory unless he or she establishes a direct causal link between a physician's negligence and the harm suffered. The law of Pennsylvania requires that no plaintiff may successfully prosecute a lack of skill or knowledge or judgment of a physician as a basis for malpractice, unless it is established that the character and quality, or quantity of attention and treatment by the physician proximately caused, as a negligent act or failure to act, harm upon the plaintiff. *Jones v. Montefiore Hospital,* 494 Pa. 410, 431 A.2d 920 (1981).

Here the plaintiff showed no lack of skill or judgment upon the part of the VA doctors, nor any departure from the recognized standards of medical care exercised by physicians in the same specialty under the same circumstances in the community, or that the physician being held accountable departed from any appropriate standards of treatment of the patient. *Price v. Neyland,* 320 F.2d 674, C.A.D.C., 1963. Additionally, as pointed out here, the plaintiff failed to prove by any credible evidence that the cyst or granuloma, or any other circumstances, that any of these were proximately caused by any action or inaction on the part of the plaintiff's doctors. While, on the other hand, the defendant's doctors showed with a conclusive preponderance of the evidence that the only plausible and possible cause for the plaintiff's unfortunate condition and sufferings was multiple sclerosis. The defendant is not chargeable for the fact that the plaintiff did suffer from multiple sclerosis. I conclude as a matter of law that in the instant case the plaintiff has failed to demonstrate any VA physicians' negligence or any harm caused to the plaintiff as a result of his treatment by the defendant.

In conclusion, the plaintiff's evidence seeks to persuade me that a cyst or granuloma near the spinal cord is the cause of his unfortunate condition. But nowhere is there any evidence that the cyst before its removal or the after-effects since removal were related physiologically or by nerve connection or interconnection to the nether part of the body (below the waist) as is the case with the plaintiff. Furthermore, the spinal column itself showed no obstruction or intrusion within it which might have compressed, deviated or interferred with its nerve function so as to cause reactions in any part of the plaintiff's physical makeup. This the plaintiff would be required to do to show a causal connection between the cyst and his regrettable condition. The defendant showed clear and convincing evidence that multiple sclerosis only could have caused his predicament.

As I carefully studied and reviewed the evidence, as a human being I could not but help feel the overwhelming and almost constant tortures which a former healthy,

physically strong, hard-laboring individual had not suffered in his pre-ailment life, without physical pains, incapacities or pressures, and without dependency upon both his wife and children. As I viewed the evidence, I found that he had become totally incapacitated from the waist down, and that it had become necessary to use artificial methods to provide the ordinary necessities of elimination because of his inability to do so. I also viewed the method which Mrs. Nolen was required to apply in cleaning the decubitus ulcers which had burrowed deep into Nolen's flesh, as the evidence presented it through the means of videotape. I feel high sympathy for both him and his wife. I could not help but feel kindly to the family as they all cooperated in moving him to and from bed, from the wheelchair and automobile. If mercy alone was the basis upon which compensation should have been paid to this man and his family, there was an abundance of it in his favor. But the rules by which I am bound as a district court in which I serve, this court can only function and be administered in accordance with legal justice.

Mercy must always permeate and temper justice within the rules of equity, but it cannot displace the law—unfortunately in this case. I cannot abandon the legal principles by which this court must be guided and directed, because this would only be an injustice against the defendant and all of its highly respected medical servants, and so compel the commission of injustice to the public at large.

While the plaintiff presented evidence and made an effort to show a connection between his ailment and the action or inaction of the defendant's medical employees, he actually presented the evidence of only one doctor who gave him some help, but even his testimony was overwhelmingly swept aside by the two other doctors of the plaintiff and by all the evidence of the defendant, other experts who testified with

credibility and unquestionably provided a preponderance of evidence in favor of the defendant and against the plaintiff.

Since the Findings of Fact and Conclusions of Law of necessity compel a verdict in favor of the defendant, judgment will be entered accordingly.

The Findings of Fact and Conclusions of Law are incorporated in this Opinion in accordance with Federal Rule of Civil Procedure No. 52.[8]

### ORDER OF COURT

AND NOW, TO–WIT, this 7th day of September 1983, in accordance with the evidence as presented in the non-jury trial of this case, and the foregoing Findings of Fact and Conclusions of Law, judgment is hereby granted in favor of the defendant.

---

8. Rule 52. Findings by the Court.
(a) Effect. In all actions tried upon the facts without a jury or with an advisory jury, the court shall find the facts specially and state separately its conclusions of law thereon . . . If an opinion or memorandum of decision is filed, it will be sufficient if the findings of fact and conclusions of law appear therein.