## Syphilis Tests

444

MORGAN, Deputy Attorney General, May 28, 1940. —
We are in receipt of your letter of recent date in which
you request our opinion upon the following statement of
facts:

The Institute for the Control of Syphilis of the Uni-
versity of Pennsylvania, although a part of the univer-
sity, is an agency coöperating with the Department of
Health for the control of that disease within this Com-
monwealth. For the services rendered at the request of
your department, the director and other members of the
institute will be paid by the Commonwealth out of funds
received from Federal grants. The Department of Health
proposes to use the facilities of the institute in cases aris-
ing under the administration of the Act of May 17, 1939,
P. L. 148, 48 PS §20, et seq. This act, inter alia, prohibits
the issuance of a marriage license to any person unless
there is produced a statement from a duly licensed physi-
cian of this Commonwealth certifying that the applicant
is not infected with syphilis; or if infected, is not in a
stage of the disease which is likely to become commu-
nicable.

Section 3 of the said act provides as follows:

"Any applicant for a marriage license having been denied a physician's statement as required by this act, shall have the right of appeal to the Department of Health of the Commonwealth of Pennsylvania for a review of the case, and the said department shall, after appropriate investigation, issue or refuse to issue a statement in lieu of the physician's statement required by section one of this act."

When an applicant has been denied a certificate by the examining physician and, pursuant to the provisions of section 3 of the act, appeals to the Department of Health, the secretary or his appointee will be impressed with the duty of determining whether or not a license should issue. To assist in arriving at such conclusion the Department of Health may request an opinion from the institute on a supplied statement of facts setting forth the history of the applicant's case, his present physical condition, the result of serological tests which have been made and any other pertinent information. The applicant would not appear at the institute for examination and the recommendation to your department would, therefore, be based upon facts and findings supplied and made by a physician not connected with the institute.

As a further part of its program against venereal disease the Department of Health proposes to make the services and facilities of the institute available to licensed physicians throughout the Commonwealth for the purpose of consultation. For example, the physician treating a person suspected of being infected with syphilis in a given stage may request the institute to advise him as to the proper treatment required. In these cases, too, the institute would be required to base its recommendation upon a history, symptology or diagnosis made and supplied by a physician in no way connected with it.

Under these circumstances you ask to be advised whether the director or any of the members of the institute would be liable in an action of trespass for malpractice for giving advice by correspondence regarding the

care of, or prescribing treatment, for, a patient he has never seen or examined, if the advice actually results in unfavorable or injurious consequences to the person regarding whom it was given.

The precise question raised by your inquiry is unique and, so far as we can determine after careful research, has never been adjudicated by the courts of this Commonwealth. There are, of course, many decided cases dealing with the civil liability of physicians for malpractice; but most of these are concerned with situations such as where a physician makes a palpably erroneous diagnosis or a surgeon carelessly leaves a gauze sponge in a wound after an operation. They deal, in other words, with those situations where the physician is guilty of some tortious conduct from which injury results in the performance of a contractual obligation to the patient. Specifically, a patient has been allowed to recover damages resulting from the negligent misdiagnosis of a venereal disease from which he was suffering: Harriott v. Plimpton et al., 166 Mass. 585, 44 N. E. 992 (1896).

The first appellate court case in this Commonwealth dealing with the liability of physicians and surgeons under such circumstances was McCandless v. McWha, 22 Pa. 261 (1853), and the rule therein established has since been consistently followed by our courts: Potter v. Warner, 91 Pa. 362 (1879); English v. Free, 205 Pa. 624 (1903); Davis v. Kerr, 239 Pa. 351 (1913); Duckworth et al. v. Bennett, 320 Pa. 47 (1935); Hodgson et al. v. Bigelow, 335 Pa. 497 (1939); Wohlert v. Seibert, 23 Pa. Superior Ct. 213 (1903); Krompoltz v. Hyman, 70 Pa. Superior Ct. 581 (1919); Remley v. Plummer et al., 79 Pa. Superior Ct. 117 (1922); Barnard v. Schell, 85 Pa. Superior Ct. 329 (1925); Veit et al. v. Hinchcliffe, 90 Pa. Superior Ct. 280 (1926); Moscicki et ux. v. Shor, 107 Pa. Superior Ct. 192, 201 (1932). It is very well stated by the Superior Court in Barnard v. Schell, supra, where, at page 334, the court says:

"The duty imposed on a physician or a surgeon is to apply such reasonable skill and diligence as is ordinarily exercised in his profession; and the test of such ordinary care, skill and diligence is that which physicians and surgeons in the same general neighborhood ordinarily have exercised in like cases, having regard to the advanced state of the profession at the time . . .".

Consultation among physicians is common but, under the usual practice, is almost invariably inclusive of an examination of the patient by the consultant. Indeed, it seems to us, one of the very purposes of consultation is the affirmation of one physician's diagnosis by another after a physical examination of the patient. Although there are no Pennsylvania decisions directly in point, the responsibility of physicians jointly engaged is well settled in other jurisdictions: Harris v. Fall, 177 Fed. 79; Keller v. Lewis, 65 Ark. 578; Hitchcock, etc., v. Burgett, 38 Mich. 501 (1878) ; Brown v. Bennett, 157 Mich. 654 (1909). In Morey v. Thybo, 199 Fed. 760 (1912), the court held at page 762 that:

"Each, in serving with the other, is rightly held answerable for his own conduct, and as well for all the wrongful acts or omissions of the other which he observes and lets go on without objection, or which in the exercise of reasonable diligence under the circumstances he should have observed."

Frequently the consultant is an expert or what is usually known as a "specialist" in some particular line of medical or surgical endeavor or in the treatment of one or more diseases. In such cases the courts of this country have uniformly followed a doctrine of liability similar to the general rule above set forth. In Baker v. Hancock, 29 Ind. App. 456, 63 N. E. 323 (1902), it is held that a specialist is "bound to bring to the discharge of his duty to patients employing him, as such specialist, that degree of skill and knowledge which is ordinarily possessed by physicians who devote special attention and study to the disease, its diagnosis, and treatment, having regard to

the present state of scientific knowledge." (Citing Feeney v. Spalding, 89 Me. 111, and McMurdock v. Kimberlin, 23 Mo. App. 523.)

Even though the patient is not aware that the physician he originally consults proposes to seek the advice of the institute regarding his condition and treatment—in other words, even though there is no contractual or consensual relationship between the patient and any member of the institute—nevertheless, we have no doubt that by agreeing to act in a consultative capacity, and to recommend care and treatment, the members of the institute assume a civil liability comparable to that of a physician in direct charge of the case and in direct contractual relationship with the patient. From an examination of the foregoing authorities it would therefore appear that the possible liability of the personnel of the institute for malpractice under the circumstances referred to would be measured by the following general rule:

One holding himself out as a specialist in the treatment of a venereal disease must possess and exercise the average degree of skill, care and diligence, possessed and exercised by physicians in the same locality who devote special attention and study to the disease, its diagnosis and treatment, having regard to the advanced state of the profession at the time. He is answerable not only for his own conduct, as aforesaid, but for all the wrongful acts or omissions of which he is cognizant of the physician who consults him which he lets go on without objection, or which, in the exercise of reasonable diligence under the circumstances, he should have observed.

In order to discuss more intelligently the professional standards relating to the diagnosis and treatment of the disease, and to recognize more fully the real gravity of the medico-legal responsibilities of the physician who assumes to diagnose and treat it, we believe that a brief discussion of the fundamental methods and problems of diagnosis may be helpful.

Syphilis—one of the most serious of human diseases—is caused by an organism known as "spirocheta pallida". In its early stages its presence is usually denoted by an open lesion of the skin or membranes of the mouth and oral cavity and a "positive" blood Wassermann reaction. Unfortunately these symptoms are not invariably present, even in the early stages, and as the disease progresses it may not be manifested in any form recognizable to the ordinary practitioner of medicine. (And it must be borne in mind that in all probability the majority of the cases which will arise under the Act of 1939, supra, will be those involving a history of old, treated and perhaps latent syphilis—difficult of diagnosis and prognosis.)

The fundamental diagnostic tests are: (*a*) The Darkfield examination, i. e., a microscopic examination of the living organism using Darkfield equipment with the ordinary microscope; (*b*) aspiration of indurated bases of lesions and glands; (*c*) staining of the organism for microscopic examination; (*d*) the blood Wassermann reaction; (*e*) precipitation tests (Sachs-Georgi, Vernes and Kahn technics) ; (*f*) spinal fluid examination; (*g*) the colloidal gold or gold sol test; and (*h*) the colloidal benzoin test.

Few of these tests can be employed without the use of special laboratory equipment in the use of which the average practitioner is not skilled and which, in most cases, he does not even possess. It is necessary, therefore, in order to make an intelligent diagnosis, for the average practitioner to refer the patient to a physician or laboratory possessing the necessary equipment or, as is done in most cases, to take a specimen of the patient's blood and send it to a laboratory for examination. We are informed that many physicians use the latter method. It is unfortunate, however, that many practitioners, apparently believing the Wassermann reaction to be infallible, base their conclusions or diagnosis solely upon the report which they receive from the laboratory. It is a known fact that positive reactions do not always denote syph-

ilitic infection. For example, specimens of blood found to produce a positive reaction have been taken from patients suffering with yaws, lepra, tuberculosis, acute exanthemata, pneumonia, trypanosomiases, relapsing fever, advanced malignant cachexia, pernicious anemia, malaria and Weil's disease. Of the blood Wassermann test, Dr. John H. Stokes, author of "Modern Clinical Syphilology", and one of this country's most eminent syphilologists, says the following:

"Few laboratory procedures involve more variables and factors known and unknown than the Wassermann reaction. Not only do the reagents employed vary in strength, but every step must be subject to control, and may vary under the most unsuspected influences. . . . The question as to whether single or repeated positive tests are false cannot be settled, in theory, short of a complete microscopic study of tissues at necropsy.

"I have gradually come to recognize that the single positive Wassermann test that is unaccompanied by any other detectable evidence of the disease, either in the form of other positives on numerous repetition or of further clinical or serologic evidence of the disease, on complete examination is likely to be a false or a nonspecific positive.

"From one-fifth to one-half the syphilis which an average clinician sees will present itself with negative Wassermann credentials, and will have to be recognized by other means or go undetected. . . . We are learning slowly and with travail to accept the negative serum Wassermann test as only an element in diagnosis instead of an infallibility.

"The [routine] blood Wassermann test is inevitably, from its availability, a species of diagnostic first line of attack . . . in the work of hospitals and group practices. If its limitations can be kept in mind, and it can be used by clinicians as a clue and not a crutch, its extension to the largest possible number of patients has much in its favor."

As we have hereinbefore indicated, the possible liability of the members of the institute would be based upon the fact that in diagnosing the ailment of a patient about whom they had been consulted, and for whom they had prescribed treatment, they did not exercise the average degree of skill, care and diligence possessed and exercised by other physicians in the same general locality who devote special attention and study to the disease, its diagnosis and treatment, having regard to the advanced state of the profession at the time: Baker v. Hancock, supra. What, then, is the standard of care and diligence exercised by other specialists in the same field? It seems to us that this inquiry need be considered only in two correlative aspects, viz., would that standard approve or condone (a) the acceptance of a diagnosis made by a physician concerning whose qualifications the members of the institute knew nothing, and (b) a recommendation regarding the treatment and care of a patient whom the member has never seen and examined supposedly suffering from a serious disease.

We have been unable to find any medical textbook authority which states categorically that advanced medical concepts either approve or disapprove of the practices above referred to. We have, however, obtained the opinion of several physicians of unquestionable reputation and ability. The consensus of this opinion would seem to indicate that, while acceptance of the diagnosis of another physician in minor matters is somewhat common, it is not considered good medical practice in cases of serious illness. In fact, the majority of the physicians informed us that in nothing short of an emergency would they accept any diagnosis without first having personally confirmed it by a physical examination of the patient. Neither would they, therefore, prescribe treatment for a patient whom they had never seen.

It is very interesting also to approach the problem from the standpoint of medical ethics and, in this connection, we direct your attention to "Principles of Medical

Ethics" as formulated by the American Medical Association. We quote from page 12 thereof:

"Sec. 4.—When a patient *is sent* to one specially skilled in the care of the condition from which he is thought to be suffering, and for any reason it is impracticable for the physician in charge of the case *to accompany the patient,* the physician in charge should send to the consultant by mail, or in the care of the patient under seal, a history of the case, together with the physician's opinion and an outline of the treatment, or so much of this as may possibly be of service to the consultant; and *as soon as possible after the case has been seen and studied,* the consultant should address the physician in charge and advise him of the results of the consultant's investigation of the case. Both these opinions are confidential and must be so regarded by the consultant and by the physician in charge." (Italics supplied.)

While it is true that the section above quoted does not, in so many words, forbid the type of consultation with which we are concerned, it does prescribe certain rules of professional conduct which would seem to contemplate in consultations a personal relationship based on a physical examination of the patient by the consultant. Furthermore, we are informed, the Judicial Council of the American Medical Association has repeatedly ruled that a physician who engages in the practice of treating patients whom he has not personally seen is guilty of unethical conduct. These rulings, however, usually involved cases where a physician prescribed by mail to a patient he had never seen and on the basis of information furnished by the patient. However, in its annual report to the House of Delegates of the American Medical Association at the San Francisco Session in 1938, the Judicial Council stated, inter alia, as follows:

"A widespread practice of renting radium for the treatment of patients by physicians not owning or being experienced in the use of radium has caused considerable discussion during the past year. Ordinarily instructions

in the technic of the use of the radium are sent by the person furnishing it. Sometimes the radium is furnished by a commercial concern, sometimes by a physician owning it. The advisability of the use of such a powerful agency by those not trained in its use and the ethics involved of prescribing and directing its use by a person who has not examined or seen the person on whom it is to be used has come before the Council. As a result of a rather extensive correspondence both from those favoring its use as described and those opposed, the Judicial Council is of the opinion that the prescribing and directing of its use in the case of a patient whom the prescriber has not examined or seen is an unethical medical procedure. The Council recognizes that advice and help in difficult cases is often furnished by those in a position to be of possible or probable assistance but it believes that the great dangers accompanying the use of radium removes that particular remedy from the field of advice without personal contact with the patient."

At this point we direct your attention to two reported cases which may be helpful to this discussion. The first is Thaggard v. Vafes, 218 Ala. 609, 119 So. 647 (1928). This was an action in trespass against a physician for malpractice resulting in the death of the patient. The evidence showed that defendant administered neosalvarsan, a drug containing arsenic, without first ascertaining whether the patient had symptoms indicating inflammation of the brain; that the treatment was dangerous if that condition were present and, if it were, it would have been readily discoverable by an examination of the heart, lungs, kidneys, pulse, and general condition. The neosalvarsan was administered on the faith of a diagnosis by another physician that the patient was suffering from syphilis. On pages 611 and 612 the court said:

"The relation of physician and patient is not necessarily contractual, but may be consensual merely, and whether one or the other, when the physician assumes and undertakes to act in this relation, he incurs the con-

sequent duty, exacted of the relation, that in the practice of the profession he will exercise that reasonable and ordinary care, skill, and diligence exercised generally by members of his profession in the same neighborhood, and a failure to observe this degree of care and diligence is negligence. This rule is elementary, and has its foundation in most persuasive considerations of public policy. . . .

"We are clear to the conclusion that it cannot be declared, as a matter of law, that a physician may rely upon the diagnosis of another, no matter how skilled, in administering drugs, in the treatment of diseases, that contain a deadly poison. The patient was entitled to have the benefit, judgment, and skill of the physician he had selected, formed from his own diagnosis."

The second case is that of Fortner v. Koch, 272 Mich. 273, 261 N. W. 762 (1935), which is also an action in trespass for malpractice. In this case it was shown that plaintiff had consulted defendant on June 22, 1931, regarding a swollen knee. Defendant diagnosed the illness as cancer but did not refer the patient to a hospital for routine laboratory examination. There being no improvement, in October 1931 plaintiff consulted another physician and was advised to go to a hospital for diagnosis. All tests made at the hospital were negative with the exception of the blood Wassermann which was strongly positive. The court, at page 280, said:

"The record also shows that when defendant made the manual examination, plaintiff had symptoms that would lead a physician to suspect cancer, syphilis, simple tumor, abscess, or tuberculosis. The usual practice among physicians and surgeons in Detroit in diagnosing the cause of a swelling such as was on plaintiff's knee when first examined by Dr. Koch in June, 1931, was not only to take a history of the patient, but also have an X-ray made, a blood test taken and a biopsy made. . . . These steps as above stated are not alternate steps in the diagnosis, but

all must be done in order that the examining physician may arrive at the proper conclusion and prescribe the correct treatment. . . .

"It is the duty of a physician or surgeon in diagnosing a case to use due diligence in ascertaining all available facts and collecting data essential to a proper diagnosis. The instant case, not being an emergency and the defendant not having used such diligence in availing himself of various methods of diagnosis for discovering the nature of the ailment as are practiced by physicians and surgeons of skill and learning in the community in which he practiced, he must be held liable for the damages due to his negligence."

Although these cases are not directly in point, the theory applied therein is, to us, most persuasive in a discussion of the questions involved in the instant case. We have concluded that no physician, and particularly no expert, is entitled, under the law, to rely on the diagnosis of such a serious disease as made by another physician; that he cannot, with impunity, make a diagnosis or suggest indicated therapy for a patient he has never physically examined. The technique or diagnosis is too difficult, the ramifications of the disease too complex. From a study of the foregoing authorities, as well as from considerations of sound public policy and the rationale of malpractice liability, we believe that a consultant who does not personally confer with and examine a patient accepts at his peril statements and reports made to him by the attending physician. To hold otherwise would be to relieve the consultant of his burden to exercise the due care and diligence required of him by law; under such circumstances "due care" certainly contemplates and requires a diligent oral and physical examination of the patient. This is particularly true when the consultant, an expert in a particular field, relies on the observations and findings of one who is not a specialist.

456

We are of the opinion, therefore, and you are accordingly advised that the members of the Institute for Control of Syphilis of the University of Pennsylvania would be liable for damages in an action of trespass for malpractice for making a diagnosis of, or prescribing treatment for, a patient they have never seen or examined, if such diagnosis or advice actually results in injurious consequences to the person regarding whom it was made or given.