**Mir M. YOSUF, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. 83–1819.**

United States District Court, M.D. Pennsylvania.

March 7, 1986.

John M. Humphrey, Rieders, Travis, Mussina, Humphrey & Harris, Williamsport, Pa., and Robert Greenspan, Landover, Md., for plaintiff.

James W. Walker, Asst. U.S. Atty., Scranton, Pa., Royce C. Lamberth and Charles F. Flynn, Asst. U.S. Attys., and Stanley S. Harris, U.S. Atty., Washington, D.C., for defendant.

## OPINION

MUIR, District Judge.

### I. Introduction.

On June 9, 1983, Yosuf M. Mir filed the complaint in this action pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.* in the United States District Court for the District of Columbia. By order of December 2, 1983, the Honorable Thomas Penfield Jackson transferred this action to this Court. Mir's action arose from an incident in which Mir fell at the Allenwood Federal Prison Camp and injured his left arm, wrist and hand. Mir alleges that the Bureau of Prisons refused him adequate and proper treatment for the injury sustained by his hand. This liability phase of the case was tried to the Court from January 16 through January 29, 1986. The Court's findings of fact, conclusions of law, and discussion of this case as to liability follow.

### II. Findings of Fact.

#### A. Medical Care.

1. Yosuf M. Mir was born in Afghanistan around 1952, came to the United States in about 1971, and became a citizen of the United States in 1985.

2. In approximately 1972, Mir suffered some type of an injury to his left wrist. The injury occurred when a baggage cart was pushed into Mir's left wrist while he was loading the cart onto an elevator in the scope of his employment with Holiday Inn. He received medical treatment for the injury. There are scars on Mir's left hand and wrist, two of which could be surgical scars. It is possible that Mir sustained a fractured wrist at this time, and it is also possible that he had a carpal tunnel release. The exact nature of the injury and the nature of the medical treatment Mir received are unknown.

3. Mir does not remember any specific details of the nature of the 1972 injury, the treatment he received for the injury or the length of his recovery time from this injury.

4. Prior to August 31, 1980, Mir had no pain, no numbness, and no limitations of any type with respect to the wrist.

5. In approximately February, 1979, while working as an assistant to a surveyor, Mir suffered a back injury. Mir experienced some back pain prior to late August 1979.

6. In July 1979, Mir was convicted of two counts of mail fraud and four counts of wire fraud, and in August, 1979 was committed to the custody of the United States Attorney General for a term of ten years.

7. In late August 1979, Mir was incarcerated at the Allenwood Federal Prison Camp, Montgomery, Pennsylvania (Allenwood), a minimum security facility under

the control of the United States Attorney General.

8. While at Allenwood, prior to August 31, 1980, Mir received medication for discomfort related to his back injury.

9. While at Allenwood, prior to August 31, 1980, Mir never complained to the prison authorities about his left wrist or hand.

10. Mir is left hand dominant.

11. At approximately 5:00 A.M. on August 31, 1980, Mir slipped on some ice which was on the floor near an ice machine outside of the bathroom of his dormitory. Upon slipping, he attempted to break his fall with his left hand, and sustained an injury to his hand, wrist, and arm.

12. Shortly after the fall, he began experiencing pain in his left hand and wrist. Mir reported to the Allenwood medical facilities in the morning.

13. Upon his initial visit to the medical facilities, Mir was seen by a physician's assistant who gave him aspirin and bandaged his hand.

14. That same morning when the pain became worse Mir returned to the medical facilities, at which time he was instructed to put ice on the hand. Mir followed this advice.

15. At approximately 9:00 P.M. on September 1, 1980, Mir was moaning and crying because of the pain. Various inmates summoned the Lieutenant who took Mir to his office and made arrangements to have Mir taken to the Evangelical Community Hospital in Lewisburg, Pennsylvania.

16. At approximately midnight, September 1, 1980, a correctional officer took Mir to the Evangelical Community Hospital. A doctor put Mir's left hand in a sling and gave Mir some medication. The doctor gave the correctional officer a document indicating that Mir should come back to the hospital the next day for rechecking and x-rays.

17. Mir was taken back to Allenwood where he had difficulty sleeping because of the pain.

18. On September 2, 1980, at 7:00 A.M., Mir again reported for sick call, and at that time a physician's assistant attempted to x-ray his left wrist and hand. However, Mir refused the x-rays because he felt that the physician's assistant was too rough in his handling of the injured hand while attempting to X-ray it.

19. On that same day, September 2, a hospital administrator at Allenwood, Mr. Roach explained to Mir that Allenwood could take the x-rays that day, that Mir would not be roughly handled and that Mir would be scheduled to see an orthopedic specialist on September 3, 1980. With those assurances, Mir agreed to the x-ray, and the x-ray was taken at 2:00 P.M. on September 2, 1980.

20. Mir's appointment with the orthopedic specialist for September 3, 1980 was rescheduled by the prison authorities for September 17, 1980.

21. Mir continued to experience pain in his left hand and wrist. By September 4, 1980 Mir's hand was becoming numb and he was unable to move the hand without pain.

22. On September 4, 1980 at approximately noon, Mir reported for sick call but was told that he had not followed the proper procedure for making a sick call appointment. At that time, Mir became agitated. Mir stated that if he wasn't in prison he could get proper care for his hand, complained generally about lack of medical attention, and indicated that he was going to file an administrative complaint. As a result of these statements, Mir was issued an incident report for behaving threateningly towards a staff member.

23. On September 4, 1980, Mir returned to the clinic and was seen by a physician's assistant. The x-rays were repeated, the wrist re-splinted, and the arm elevated.

24. At the time of his examination on September 4, 1980, Mir complained of numbness in the thumb and middle fingers of the left hand.

25. On September 4, 1980, the hand and wrist appeared yellowish in color, warm to

the touch, with no swelling, no ecchymosis and no lacerations.

26. The x-rays taken on September 4, 1980 were not read by a radiologist until September 18, 1980, when the following report was made:

There is a 1 × 2 cyst in the distal metapharys (sic) of the radius with a partial sclerotic border. There is no fracture but it would be easily susceptible to a future fracture. It could be due to old inflammation. Follow-up is suggested in a month or two.

27. On September 5, 1980, Mir was transferred to the Segregation Unit at the United States Penitentiary at Lewisburg, Pennsylvania (Lewisburg) pending a hearing on the incident report filed September 4, 1980.

28. When Mir arrived at Lewisburg, Mir complained to staff at Lewisburg that he had been beaten while in transit by the two correctional officers transporting him to Lewisburg. After delivering Mir to Lewisburg, the correctional officers who transported Mir wrote an incident report against Mir for threatening the correctional officers.

29. Mir was put in segregation at the Lewisburg on September 5, 1980.

30. At approximately 3:00 P.M. on September 5, while in segregation, Mir was seen by Dr. Stallworth, a staff general surgeon at Lewisburg Penitentiary. Dr. Stallworth found that Mir's problem was beyond her range of expertise and recommended referral to an orthopedic specialist. Dr. Stallworth prescribed no pain medication. No other treatment was given to Mir at that time.

31. On September 11, 1980, Mir was taken to see an orthopedist, Dr. J. Arnold Donovan. Dr. Donovan examined Mir and stated in a report that Mir was complaining of numbness and pain in the wrist.

32. Dr. Donovan found no muscle wasting or atrophy.

33. The Doctor stated that the X-rays showed no fracture. Dr. Donovan opined that there was some arthritic changes of the radial carpal joints indicating an old injury and changes there and a cyst formation of the distal radius.

34. Dr. Donovan did not find any serious pathology. He stated in his report that Mir was completely uncooperative, extremely hostile and needed some psychiatric help.

35. Dr. Donovan was of the opinion that if Mir's wrist caused him further trouble, he should be transferred to the United States Medical Center for Federal Prisoners at Springfield, Missouri (Springfield) where Donovan felt that they were more capable of dealing with Mir's hostility.

36. Following the examination by Dr. Donovan, Mir was transferred back to the Segregation Unit at Lewisburg.

37. Mir was seen by Dr. Dudley Turner, another staff physician at Lewisburg, on September 16, 1980. This examination was the result of a phone call to the prison authorities from the Honorable Richard P. Conaboy of this Court.

38. Dr. Turner took a history which included Mir's previous back problem and his hand and wrist injury of August 31, 1980. No treatment was rendered by Dr. Turner.

39. On September 18, 1980, Dr. Mahoney, a psychiatrist at Lewisburg Penitentiary, saw Mir and concluded that Mir had no noticeable psychiatric defect at that time. No treatment for the wrist injury was rendered by Dr. Mahoney.

40. At various times during his confinement to segregation at Lewisburg, Mir attempted to obtain medical treatment for his hand and wrist by putting notes on his cell door indicating that he was in pain and requesting medical attention.

41. In addition to posting notes, Mir orally complained of pain and numbness in his hand and sought medical attention.

42. These written and oral pleas for help did not result in the administration of other than an occasional aspirin or aspirin-type pain relief medicine.

43. Special housing review records, dated September 11, 1980, September 16, 1980,

October 9, 1980, October 16, 1980, October 23, 1980 and October 30, 1980, indicate that Mir was seen daily by medical staff but do not indicate any treatment administered or indicate that Mir was complaining of pain.

44. Besides the occasional administration of aspirin-type pain relievers, the examinations noted above were the only medical treatment received by Mir for his injured wrist and hand from the time he was transferred to the Lewisburg Segregation Unit on September 5, 1980 until an order of this Court by the Honorable Richard P. Conaboy dated December 11, 1980.

45. On or about September 29, 1980, Mir filed a pro se habeas corpus petition in which he alleged that he was being held in segregation illegally, that he was being denied access to the Courts, and that he was being denied proper medical treatment for the injury suffered on August 31, 1980.

46. The Respondent in the habeas corpus proceeding, Joseph S. Petrovsky, filed a response to the petition on October 20, 1980, wherein Mir's allegations were generally denied.

47. Because of conflicts in the allegations, by Memorandum and Order dated December 11, 1980, the Honorable Richard P. Conaboy appointed an independent orthopedic specialist, Dr. Frederick R. Amsler, Jr. of Williamsport, Pennsylvania to examine Mir.

48. On December 12, 1980, the day after the issuance of Judge Conaboy's order, Mir was given pain medication (norgesic, two tablets three times a day as needed to last five days).

49. Throughout the time that he had been at the Lewisburg Segregation Unit from September 5, 1980 until December 12, 1980, Mir had been denied any pain medication except aspirin-type drugs, even though he had been receiving prescription pain medicine at Allenwood for his back problems.

50. Pursuant to Judge Conaboy's Order of December 11, 1980, Mir was examined and evaluated by Dr. Amsler on December 16, 1980.

51. As a result of the examination, Dr. Amsler issued a report to Judge Conaboy, dated December 29, 1980, which set forth his findings, conclusions and recommendations. The report provided as follows:

Mir M. Yosuf is a 27 year old prisoner at the Lewisburg Penitentiary who was examined in my office on December 16, 1980. Mir Yosuf states that he was in normal health until about 5:00 a.m. in the morning on August 31, 1980, when he slipped on chips of ice outside an ice maker near his cell at the Lewisburg Penitentiary. The patient tried to break his fall with the extended left upper extremity. As he impacted he injured his left wrist. He has had severe pain in the left wrist since that date. The patient has been attended on numerous occasions by various physicians, however, in spite of this attention and care he has gone on to develop a useless chronically painful wrist and hand. The patient notes that prior to this injury he was left handed and wrote with his left hand but since the injury has had to use his right hand for writing. He has difficulty using the left hand for light activities and does not use the hand for dressing or eating. At the present time he uses his right hand to accomplish all of these functions. The patient notes that so long as he does not use the hand or move the wrist, the pain is minimal, however, any motion associated with this wrist causes severe pain. In addition to the pain the patient also has a numbing sensation involving the thumb, index and long finger of his left hand.

My examination on December 16, 1980, revealed an alert male who seemed comfortable sitting on the examination table with his left arm resting on a pillow. The patient had virtually no active flexion or extension of the fingers of the left hand and he maintained the wrist in a position of about 30 degrees flexion and the fingers were in more or less neutral position. Attempts to passively flex or extend the fingers were associated with sharp pain in the wrist and hand. Sensa-

tion was tested with light touch and there was a decreased sensibility to light touch in the thumb, index and long finger. The patient noted that he had relatively normal flexibility and sensation in the small finger of the left hand.

Range of motion testing of the elbow revealed the patient had 45–50 degrees pronation and supination of the elbow. The patient hesitated to move the elbow because the motion of the elbow indirectly affected the hand and wrist. However, with careful examination we determined the patient had motion in the elbow from 30 degrees to 120 degrees. There was no tenderness to palpation over the shoulder, arm, or forearm. However, there was tenderness to even light pressure over the volar and dorsal aspect of the left wrist. There is a well healed incision over the distal radius on the left side which the patient states is related to a fracture which occurred about eight years ago. Following that injury the patient notes that he had regained full and normal use of the wrist and hand.

Subsequent examination of the left hand and wrist reveals the patient has arthrosis with narrowing of the joint space between the distal radius and the proximal row of carpal bones. There is an irregular cystic cavity in the distal radius which measures two by three centimeters on the anterior posterior view of the wrist joint. This lesion appears to be lytic in nature and the borders are well defined on the ulnar aspect but poorly defined proximally. Based on this x-ray examination I cannot make a specific disagnosis (sic.) as to the nature of this lesion. In any event he does have an arthrosis or degenerative disease which may be traumtic (sic.) in origin at the carpal radial joint and lytic lesion the etiology of which is not determined. Based on this examination it is my impression that the patient has a partial anylosis of the left wrist secondary to trauma and a tumor in the distal radius. He also has a carpal tunnel syndrome with associated compression of the median nerve in the region of the wrist joint.

It is my recommendation that this patient obtain further evaluation which would include the following:

1. Bone scan

2. Conduction velocity median nerve left hand

3. A biopsy of the lesion of the left wrist.

Subsequent medical treatment depending on the nature of the bone lesion may include a fusion and a decompression with neurolysis of the median nerve at the wrist joint. Until specialized treatment can be completed it is my recommendation that the patient have the wrist supported with a volar plaster splint secured to the hand, wrist and forearm with an elastic bandage.

52. Dr. Amsler sent a copy of the report to the Medical Department of the Lewisburg Penitentiary where Mir was still being held in segregation.

53. Mir wore the splint provided to him by Dr. Amsler, and was given pain medication by the medical personnel at the Lewisburg Penitentiary pursuant to prescriptions provided by Dr. Amsler.

54. On December 18, 1980, Mir was seen by Dr. Mahoney who noted that Mir complained of pain but did not appear to Dr. Mahoney to be in distress. Mir received some pain medication for his complaint.

55. On January 8, 1981, the Respondent in the habeas corpus action filed a Motion with the Court requesting permission to transfer Mir to the United States Medical Center for Federal Prisoners, at Springfield, Missouri (Springfield) " ... for medical work-up and report of examination consistent with the report of examination submitted by Dr. Frederick R. Amsler of Williamsport, Pennsylvania."

56. On January 13, 1981, Judge Conaboy issued an Order setting forth in the background of the order that Dr. Amsler's report had " ... recommended a medical work-up and specified three procedures

which should be performed." The Order granted the Respondent's Motion for leave to transfer Mir to Springfield for that medical work-up.

57. Mir arrived at the Medical Center for Federal Prisoners at Springfield, Missouri, on January 23, 1981.

58. He was examined by a physician's assistant on January 24, 1981. The physician's assistant took a history, and with respect to the hand injury noted complaints of pain, swelling, and loss of feeling in all fingers of the left hand. The history also set forth the background of Mir's back problem. On examination, the physician's assistant noted swelling of the left wrist and that Mir would not cooperate in testing Mir's reflexes on the left side.

59. Also on January 24, 1981, Mir was given restricted work duties. He was required to run an elevator which he claimed was difficult for him to do.

60. On January 26, 1981, Mir was seen by an orthopedic specialist, Dr. William Francis, who was employed at Springfield. Dr. Francis examined Mir's left forearm, noted a one-quarter inch atrophy of the left forearm compared to the right, but otherwise found no objective findings of medical problems and indicated that Mir's symptoms were subjective. Dr. Francis ordered x-rays and put Mir on light duty work.

61. An x-ray of the left wrist was taken on January 26, 1981, and a report dated January 27, 1981, read as follows:

Degenerative arthritic change of the wrist with an arthritic cyst at the distal radius, is seen. The radial-lunate and radial-capitate are narrowed with sclerosis. There is irregularity of the posterior surface of the first row of carpal bones. All these changes are consistent with degenerative arthritic change. There are no fractures or dislocations seen.

62. Also, on January 26, 1981, Dr. Francis took away Mir's wrist brace which had been provided to him by Dr. Amsler, and ordered physical therapy for a period of two weeks.

63. All medication which had previously been prescribed by Dr. Amsler was stopped upon arrival at Springfield.

64. Mir was seen by the physical therapist on February 1, 1981, whereupon it was determined that he would receive range of motion exercises, whirlpool, and electric stimulation from February 2 through February 18, 1980.

65. Eleven physical therapy sessions were scheduled. Mir attended five out of the eleven sessions. Mir first received physical therapy on February 4, 1981, and received it thereafter on February 5, 9, 10, and 11. No reason is listed in the record for Mir's not attending six of the eleven scheduled sessions. The reason for Mir's absence from the scheduled therapy sessions is not known to the Court.

66. The physical therapist at Springfield intended to instruct Mir at the last scheduled therapy session to continue to do therapeutic hand exercises. Mir was never given this instruction.

67. While at Springfield, Mir was also examined in connection with his back problem.

68. On February 5, 1981, Dr. Francis dictated the "Transfer Summary" which provided in part as follows (with respect to the wrist):

Our examination revealed nothing but subjective findings which consisted of holding the hand in a slightly flexed position. The patient had good passive function of his extremity. There was no evidence of atrophy. Healed scars were noted on the volar surface. Subjective complaints or hypesthesia were noted, but there was no evidence of atrophy in the hand or forearm and no indication of neurovasular deficit.

. . . . .

X-rays of the left upper extremity revealed an old fracture healed in excellent position. No evidence of tumor was noted and there was no evidence of infection or other orthopedic disease.

. . . . .

RECOMMENDATIONS: This patient can be transferred to any other institution at any time by any means of transportation. He can go through the main line into full duty. No medication or other treatment is needed.

PROGNOSIS: Somewhat guarded because of the patient's attempt at making much more of his problem than exists medically or can be diagnosed from an objective standpoint. The patient has a spondylolysis, which I do not think is creating any clinical problems. No orthopedic disease is found in the left upper extremity.

FINAL DIAGNOSIS:

(1) Healed fracture, left wrist, asymptomatic.

(2) Spondylolysis, L5–A1, asymptomatic.

69. On February 13, 1981, while still at Springfield, Mir was seen by a psychologist, Dr. Horvat, who found Mir to be verbal, coherent and well-oriented, with no evidence of psychosis.

70. Mir was transferred from Springfield on February 19, 1981.

71. During his stay at Springfield between January 23 and February 19, 1981, with respect to the left wrist, Mir had one x-ray taken and attended five out of eleven sessions of physical therapy. He received none of the tests which had been recommended in Dr. Amsler's report of December 29, 1980, and which were in part the basis for the Court's ordering Mir's transfer to Springfield, although the tests were not specifically ordered to be done by the Court.

72. As indicated in the Transfer Summary, Dr. Francis ordered that there be no further medical care given to Mir for his left wrist complaints. Dr. Francis did not suggest any follow-up.

73. Neither Dr. Francis nor anyone at Springfield advised Mir to continue exercising his hand. Additionally, no therapy was ordered by the personnel at Springfield for Mir to take place after transfer from Springfield.

74. Mir spent approximately two weeks in transit from Springfield to the Lewisburg Penitentiary where he was returned to the Segregation Unit.

75. Mir remained in the Segregation Unit at Lewisburg Penitentiary from March 1981 until November 1981 when he was transferred to the Lewisburg Farm Camp.

76. During the time that he was in segregation from approximately March, 1981 through November 1981, despite numerous complaints of pain and numbness in his wrist and hand, Mir received no medical attention for these complaints.

77. In September 1981, in Mir's habeas corpus action, *United States of America ex rel. Yosuf v. Petrovsky*, Civil No. 80–1080 (M.DPa. Conaboy, J.) Mir filed a Motion requesting that the tests which had been recommended by Dr. Amsler be performed by Dr. Amsler at the Williamsport Hospital.

78. The Respondent did not object to the request that the tests be performed but requested Judge Conaboy to order that the tests be performed at Geisinger Medical Center.

79. On December 4, 1981, Judge Conaboy ordered that Mir be taken to the Geisinger Medical Center on December 11, 1981, so that Geisinger medical personnel could consider performing a bone scan and conduction velocity test as recommended by Dr. Amsler, and any other tests that they deemed advisable.

80. Mir was taken to Geisinger Medical Center on December 18, 1981, and was seen in the Orthopedic Department at which time an electromyography (EMG) and bone scan were scheduled.

81. On January 28, 1982, the EMG and bone scan were done at Geisinger Medical Center. The EMG report dated January 28, 1982 indicated that the tests were compatible with " ... left median neuropathy, localization, but may well be above the carpal tunnel." Said results are consistent with the injury which Mir reported to his left wrist on August 31, 1980.

82. The bone scan taken on January 28, 1982 showed, " ... hyperconcentration of activity in the left wrist region, consistent with a history of left wrist fracture." Said test results indicated an on-going problem in the left wrist area.

83. The EMG and the bone scan provided objective evidence of the symptoms about which Mir had been complaining since August 31, 1980. Nevertheless, the tests did not account for the degree of pain Mir claimed to be experiencing.

84. Despite the above test results, Mir still received no medical treatment for his wrist symptoms until after a habeas corpus hearing held on June 16 and June 17, 1982 before Judge Conaboy.

85. The Lewisburg medical personnel began prescribing pain medication for Mir on July 14, 1982.

86. On July 26, 1982, Judge Conaboy issued an Interim Order stating that, " ... during the course of the hearing it became evident to this Court that Petitioner's claim of inadequate medical care has a very substantial basis in fact, and that the Petitioner is in need of further examinations and care concerning the condition of his right [sic] wrist." The Order provided, inter alia:

1. The Defendant is directed to make immediate arrangements to have electromyogram and whatever additional neurological and physical tests are necessary in order to attempt to identify the source of petitioner's complaints and the adequate treatment program necessary to care for those complaints.

2. That these services are to be arranged at the Geisinger Medical Center and the testing and care is to be continued under the direction of the said Geisinger Medical Center.

87. Mir was re-examined at Geisinger Medical Center by neurologist Dr. John P. Carlson and was subjected to repeat electromyography on July 28, 1982.

88. The EMG results were not significantly changed from the EMG results of January 28, 1982.

89. Dr. Carlson was of the opinion that Mir had a mild chronic left median neuropathy, that he had an abnormal x-ray of the left wrist, and that he was suffering from chronic pain syndrome.

90. In a letter to Dr. Turner of the United States Penitentiary, Lewisburg, Pennsylvania dated August 13, 1982, Dr. Carlson recommended against surgery, but indicated that if Mir continued to experience discomfort he should be referred to a pain clinic, specifically mentioning one supervised by a Dr. Gorby, an anesthesiologist at Geisinger specializing in pain problems.

91. Mir continued to experience discomfort but was never referred to Dr. Gorby or a pain clinic.

92. In November, 1982, Mir was transferred from Lewisburg Penitentiary to a half-way house in Washington, D.C.

93. Apparently in lip-service deference to the Honorable Richard P. Conaboy's orders of August 4, 1982 which recommended that Mir be paroled promptly, Mir's parol date was made retroactive in late January 1983 to November 29, 1982.

94. As of the time he was released from Lewisburg in November, 1982, Mir continued to have pain in his left wrist and hand, numbness in his left hand, and continued not to move the left wrist and hand.

95. The numbness in the left hand was consistent with median nerve neuropathy noted in the various EMG reports.

96. From the time that he was transferred from Lewisburg in November, 1982 to the half-way house until he was released from custody, Mir received no medical treatment for the problems with his left wrist.

97. Medical care for Mir could have included steroid injections, physical therapy, pain medication, instructions on how to exercise his hand and the importance of daily exercise, and, if these measures did not secure relief, and as a last resort, surgery.

98. At a minimum, appropriate medical care should have included prescriptions for appropriate pain relief medication, physical

therapy and instructions to Mir concerning the necessity of moving his hand, fingers and wrist so as to prevent the muscles and joints from stiffening.

99. From the time of his injury on August 31, 1980 to the time of his release from custody, Mir received no treatment other than two weeks of physical therapy at Springfield and a very modest amount of pain medication.

100. Failure to give Mir adequate pain medication, instructions and physical therapy has resulted in a severely decreased use of his hand.

### B. Loss of Real Estate.

101. At the time of his incarceration in 1979, Mir owned a piece of real estate in Springfield, Fairfax County, Virginia, located at 7212 Sydenstricker Road. The property was a one-acre lot with two frame units located thereon.

102. The Burke and Herbert Bank and Trust Company of Alexandria, Virginia held a first deed of trust mortgage in the amount of $33,000 on the property. There was also a second trust in the amount of approximately $3,000.00.

103. When first incarcerated, Mir was leasing the property to tenants and the rent received therefrom was used to make the mortgage payments to the Burke and Herbert Bank & Trust Company (the Bank).

104. Sometime in 1980 the tenants stopped paying rent and the payments on the mortgage fell in arrears.

105. By letter dated July 24, 1980, the Bank indicated its intent to institute foreclosure proceedings for failure to pay principal and interest payments due. The letter of July 24, 1980 showed that copies were sent to C.S. Taylor Burke, III, Mrs. Barbara A. Jewell, Mr. DiJoseph (Mir's attorney) and Century 21 (Mir's rental agent).

106. By letter dated July 25, 1980, the Bank advised Mir that Mir would be furnished with a copy of the clipping from the local newspaper advertising the foreclosure sale showing the time, place and date of the sale. A copy of this letter was sent to Attorney DiJoseph.

107. By letter dated July 28, 1980, Mir acknowledged receipt of the Bank's letter of July 25, 1980.

108. Mir's letter of July 28, 1980 requested that the Bank send information concerning the amount of arrearages so that he could arrange to have payment sent to the Bank.

109. By letter dated July 31, 1980, the Bank informed Mir that the amount of arrearages was $864.96 and that payment of $864.96 must be in its hands by August 8, 1980 to avoid foreclosure proceedings. A copy of this letter was sent to Attorney DiJoseph.

110. By letter dated August 5, 1980, Mir asked the Bank for an additional month to make the necessary payment.

111. By letter dated August 21, 1980, Mir informed the Bank that he had sent by separate letter $1,200.00 in full payment of the arrearages and requested that the Bank send him a receipt. Mir had not sent the $1,200.00 to the bank.

112. By letter dated August 26, 1980, the Bank acknowledged receipt of Mir's August 21, 1980 letter but advised that the $1,200.00 had not been received and that the Bank was proceeding with the foreclosure.

113. A legal advertisement concerning the foreclosure on Mir's property appeared in a Virginia newspaper on August 29 and September 5, 1980 and showed that a Sheriff's sale was scheduled for noon on September 19, 1980.

114. Mir's nephew saw the clipping, cut it out, and mailed it to Mir at Allenwood. The clipping was forwarded by Allenwood to the Lewisburg Penitentiary where Mir received the clipping on September 8, 1980.

115. Sometime prior to September 10, 1980 Mir spoke with an employee of the Bank by telephone about stopping the foreclosure, and was advised that it would be necessary to bring the note to date and pay the costs of advertising.

116. By letter to Mir dated September 10, 1980, the Bank enclosed a photocopy of the foreclosure advertisement and the amount of the costs Mir would have to pay to stop foreclosure.

117. By letter dated September 10, 1980, Mir advised the Bank that a friend would be sending the Bank a $1,200.00 check. The check was not sent. In this letter, Mir informed the Bank that his conviction had been overturned and that he would soon be leaving his then address for the re-trial.

118. Mir's letter of September 10, 1980 provided the Bank with the telephone number of his Attorney, Mr. DiJoseph, and requested that the Bank contact Mr. DiJoseph.

119. Mir's letter of September 10, 1980 also stated that Mir had called the Bank but had been unable to reach Mr. T. Burke, the President.

120. On September 8, 1980, Mir began requesting permission to make a telephone call to his attorney for the purpose of arranging for someone to pay the arrearages.

121. Between September 5, 1980, and September 19, 1980, John A. McKenzie, an instructor in the Islamic faith and an acquaintance of Mir's was notified that Mir had been taken to Lewisburg's segregation unit.

122. McKenzie made an appointment to see Mir as his religious advisor.

123. McKenzie visited Mir in the visiting room in the Lewisburg Penitentiary.

124. At the visit, Mir asked McKenzie to call the Bank or Mir's relative for the purposes of paying the arrearages and preventing the Sheriff's sale.

125. McKenzie could not remember the lengthy and unusual Afghan name of the relative and did not have pen and paper. McKenzie then asked the guard for paper and pencil but the guard informed him that he must leave the visiting area.

126. The guard stated that McKenzie was admitted as a religious advisor and the request was not within the scope of his visit. McKenzie was ejected from the visiting room.

127. McKenzie claimed he would have contacted the Bank or Mir's relatives or attorney in an effort to halt the foreclosure, but that he could not recollect the name of the bank or the names of Mir's relatives or attorney and therefore was unable to contact them.

128. By letter dated September 16, 1980, the Bank informed Mir that the foreclosure would take place on September 19, 1980 and that the $1,200.00, even if received would not be sufficient to prevent the foreclosure. This letter indicated that a copy of the letter was sent to Attorney DiJoseph.

129. Beginning on September 8, 1980, Mir made numerous requests for permission to make a phone call. On September 18, 1980, Mir was taken to the office in the segregation unit for the purpose of making a phone call. A guard dialed the number of Mir's attorney in Virginia, but the attorney was not in the office and Mir never talked to the attorney.

130. Mir asked for an additional phone call but his request was denied on the ground that the call to which he was entitled had been made.

131. Mir's house was sold at Sheriff's sale on September 19, 1980 for $37,000, which paid off the mortgage and the second trust on the property.

132. By letter dated October 4, 1980, Mir acknowledged receipt of the Bank's letter of September 16, 1980, and Mir advised the bank that a friend would contact the Bank to pay off the balance of the mortgage.

133. By letter dated October 7, 1980, Mir advised the Bank that when Mir spoke on the telephone to the Bank's representative, Mr. David Burke, Mir did not understand why Mr. Burke had not received the money. Mir informed him that the Bank had not received the check from Mir's friend. Mir was told by his friend that Mir's friend's check had been returned to him by the Bank. When his friend's attor-

ney called the Bank, he was advised that the Bank would not accept any payment except payment in full.

134. By letter dated October 8, 1980, C.S. Taylor Burke, the Bank's president, informed Mir that the Bank had received no further payments on the mortgage note since its letter of July 25, 1980, and that the property had been sold on September 19, 1980.

135. Burke in the letter further informed Mir that the purchaser of the property was Gregory L. Murphy. The letter stated that, "It is my personal opinion that Mr. Murphy may have changed his mind about keeping the property and that he might be induced to sell it for slightly more than he has in it." The letter gave Mr. Murphy's address and telephone number. The letter indicated that a copy was sent to David M. Burke and Attorney DiJoseph.

136. Neither Mir nor his relatives contacted Mr. Murphy to attempt a repurchase.

137. Attorney DiJoseph, Mir, and Mir's relatives, friends, including McKenzie, and the friend Mir refers to in his letters of September 10, 1980 and October 7, 1980 were aware of the foreclosure proceedings.

### III. Discussion.

### A. Medical Care.

### Jurisdiction and Applicable Law.

■ Count 1 of Mir's complaint alleges that the Bureau of Prison medical personnel committed medical malpractice by neglecting to give him adequate care. The claim is brought pursuant to the Federal Torts Claims Act, 28 U.S.C. 2671 *et seq.* Jurisdiction is conferred by 28 U.S.C. § 1346(b). The Federal Tort Claims Act provides in relevant part that the United States shall be liable " ... under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." To determine the applicable law, we look to see where the act or omission occurred and then apply the entire law of that jurisdiction. *Richards v. United States*, 369 U.S.

1, 9–10, 82 S.Ct. 585, 590–91, 7 L.Ed.2d 492 (1962). Since all of the acts regarding Mir's medical care save for the treatment Mir received at the United States Medical Center for Federal Prisoners, Springfield, Missouri took place in Pennsylvania, we shall apply Pennsylvania law. This matter sounds in tort so that Pennsylvania's tort law is to be applied. *Madrin v. Wareham*, 344 F.Supp. 166 (W.D.Pa.1972).

■ The three crucial elements of every tort action are (1) the existence of a legal duty flowing from the defendant to the plaintiff, (2) the breach of that duty, (3) and injury as a proximate result of the breach of the legal duty. We shall address each of these prerequisites to recovery *seriatim.*

1. Legal Duty.

■ The United States Bureau of Prisons has a duty to provide adequate medical care to a prisoner. *Cf. Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The Court of Appeals for the Third Circuit has stated that neglect, carelessness, or malpractice is not cognizable under 42 U.S.C. § 1983 but it is properly the subject of a tort action. *Hampton v. Holmesburg Prison Officials*, 546 F.2d 1077, 1081 (3d Cir.1976). Mir's complaint alleges neglect, carelessness and malpractice. In *McCandless v. McWha*, 22 Pa. 261 (1883), the Supreme Court of Pennsylvania stated that the duty of a physician to a patient is " ... not to cure ... but to treat the case with diligence and skill". *Id.* at 267. The duty the Bureau of Prisons owed to Mir is that of a physician to a patient. This duty is to be performed under the standard of " ... reasonable skill and diligence." *Id.* at 268. This reasonable skill and diligence is the manner in which " ... thoroughly educated surgeons ordinarily employ ..." in their care of a patient. *Id.* The Court of Appeals, reflecting on the evolution of Pennsylvania malpractice law, has stated that:

We point out that a person going to a doctor for treatment impliedly contracts with him for treatment and under the

law of Pennsylvania, if the doctor fails to afford proper treatment and care, a malpractice suit sounding in tort can be maintained. *Brown v. Moore,* 247 F.2d 711, 716 (3d Cir.1957).

Malpractice in Pennsylvania consists of a negligent or unskilled performance by a physician of duties which are devolved and incumbent on him on account of his relation with his patients, or of a want of proper care and skill in the performance of a professional act. *Nolen v. United States,* 571 F.Supp. 295, 302 (W.D.Pa.1983); *Hodgson v. Bigelow,* 335 Pa. 497, 7 A.2d 338 (1939). A doctor is liable for failure to exercise ordinary skill, care and diligence which results in injury to the patient. *Incollingo v. Ewing,* 444 Pa. 263, 299, 282 A.2d 206 (1971). Pennsylvania recognizes a physician has a duty to perform adequate and complete tests in order to secure a sufficient factual basis upon which to support a diagnosis or judgment. *Smith v. Yohe,* 412 Pa. 94, 100, 194 A.2d 167 (1963); *Nolen v. United States,* 571 F.Supp. at 302. Thus, it appears that a breach of duty in a medical malpractice case in Pennsylvania would exist if (1) inadequate and incomplete tests were performed or (2) if adequate testing was performed, the care subsequent to that testing did not meet the standards of the profession. Therefore, the Bureau of Prisons had the duty to give adequate tests and the care those tests indicated.

2. Breach of Duty.

A. Duty to Test.

██ The United States has argued that it administered proper tests by first taking X-rays on the 2nd and 4th of September 1980 and having Mir seen by Dr. J. Arnold Donovan on September 11, 1980. Additionally, the United States argues that further testing was performed at Springfield. Regardless of the fact that much of the testing provided was induced by the intercession of the Honorable Richard P. Conaboy of this Court, we find that the Bureau of Prisons, although lethargic in their reaction to Mir's needs, did eventually supply adequate tests. Therefore, if there is a breach

of duty, the breach must relate to inadequate care following the tests given.

B. Adequate Care.

██ It was incumbent upon the Bureau of Prisons to give Mir the requisite care which the tests warranted. *Incollingo,* 444 Pa. 263, 282 A.2d 206; *Nolen,* 571 F.Supp. 295. The United States argues that the procedures followed by its medical personnel, such as splinting Mir's wrist shortly after the fall, applying ice, administering small amounts of pain killer and supplying Mir with two weeks of therapy while he was at Springfield pursuant to an order of this Court was sufficient as the only care the tests necessitated or are a respected alternative to surgery. The United States argues that the gist of Mir's complaint is that the Bureau failed to provide invasive surgery. The United States insists that invasive surgery was simply not the course of treatment which the Bureau of Prisons chose, or which the tests warranted. They contend Mir was malingering. Mir's complaint, nonetheless, alleges a total lack of reasonable medical care from the time of his injury until release from the Bureau of Prisons. Mir asserts that no proper medical care was given at any time, that he had constant pain and that he is not malingering. The United States argues that the procedures followed (ice, a splint, small amounts of pain killer, two weeks of therapy and no invasive surgery) represent an alternative course of treatment which were entitled to be followed and therefore the United States was not negligent in following that course. In *Harringan v. United States,* 408 F.Supp. 177, 186 (E.D.Pa.1976), the Court stated: "In Pennsylvania, if a doctor follows one of two lines of thought or belief supported by reputable, respectable, and reasonable medical experts, then he cannot be found negligent." *Id. citing Tobash v. Jones,* 419 Pa. 205, 213 A.2d 588 (1965). We agree that there are reputable, respectable, and reasonable differences in the medical opinion as to whether Mir suffers from a carpal tunnel syndrome or a chronic pain syndrome. There are also rep-

utable differences among doctors as to whether a carpal tunnel syndrome must always require invasive surgery. Additionally, of the many doctors who testified, only Dr. Amsler was vigorous in his support of invasive surgery. Thus, we find that the Bureau of Prisons did not breach its duty by not authorizing invasive surgery.

The United States argues that its application of a splint and ice immediately after the injury, an occasional administration of pain killer and two weeks of therapy pursuant to an order of this Court administered five months after the injury equates an accepted alternative treatment pattern. This treatment pattern, the United States contends, was an alternative course of treatment accepted by members of the medical profession for treatment of Mir's elements, and thus no malpractice was committed. Additionally, the Bureau contends that Mir was malingering, that there was no objective evidence to support the pain which Mir said he experienced, and thus the limited attention or treatment rendered was adequate. The claims regarding there being no objective evidence are without merit. The claim regarding the treatment being adequate contradicts the factual history. In short, Mir, who was originally a minimum security prisoner, spent the greatest part of his incarceration following the injury in segregation. While in segregation, Mir was given almost no pain killer for the pain of which he complained. The Bureau of Prisons argues that it ceased administering pain killer including the pain killer which had been administered for Mir's back pain prior to September 5, 1980, because there was insufficient evidence in the objective medical information before it to support the degree of pain to which Mir complained. We have found as a fact that there is no basis in the medical record for the *degree* of pain Mir claims to have suffered. Nonetheless, there was ample evidence to show as an alternative to Mir's allegation of suffering from carpal tunnel syndrome that Mir suffered from chronic pain or a "chronic pain syndrome" as testified to by Defendants' expert, John Carl-

son, M.D. There was certainly evidence that Mir was suffering some pain. Therefore, at the very least, pain medication should have been afforded Mir beyond the limited amount given to him. In addition, even if the Bureau of Prisons medical personnel were of the opinion that the pain in Mir's wrist and hand did not warrant prescription pain killers, the Bureau has failed to explain why once Mir was transferred from Allenwood following his injury to the wrist and hand, the pain killer he had been receiving for his back was stopped. We can find no explanation of why the Bureau failed to continue to administer *this* pain killer other than insensitivity to Mir's complaints of pain. The total lack of other than a very small amount of pain killer administered to Mir amounts to a breach of the duty of reasonable medical care running to Mir and therefore medical malpractice on behalf of the Bureau of Medical Staff. A reasonable man in the exercise of ordinary medical skill and knowledge would, at a minimum, have prescribed pain killer to be administered daily. In addition, the medical treatment given Mir was lacking in one other aspect, that being a lack of instruction on how to cope with pain and, more importantly, a lack of instruction on the need to exercise the hand or wrist.

At one point it was suggested that Mir attend a pain clinic to learn to cope with the pain associated with movement of the hand and wrist. This was not done. Thus, the Bureau allowed Mir's complaints of pain to fall on deaf ears, while Mir used the pain as a reason for not moving his hand and wrist. This non-use of the hand and wrist has resulted in a useless limb. The Bureau should have foreseen that not instructing Mir to use his hand would have caused this result.

The Bureau did not follow through with instructing Mir to continue therapy, ordering that therapy be continued, or at the very least, ordering that Mir be given another check-up in a month or two after his release from Springfield. Instead, Dr. Francis ordered that Mir be returned to

any other federal institution by any means whatsoever with "... no medication or other treatment ..." Dr. Francis further stated that Mir could perform full duties. We find this to be totally contrary to proper care and skill incumbent on a doctor. This directive of Dr. Francis is contrary to the views of the other members of the profession who testified. These other professionals were of the opinion that Mir should have had additional therapy and should have been instructed to continue to use his hand and to perform exercises with the hand. The United States has attempted to argue that what Dr. Francis meant by full duty, no medication, no treatment, was actually positive encouragement to Mir to attempt to cope with his pain and to utilize his hand so that it would not stiffen and become useless. When Dr. Francis's instructions are viewed in light of the overall picture of Mir's treatment, that they could be deemed words of encouragement, instruction or a method of treatment is absurd. Mir received no positive encouragement from the Bureau of Prisons and no instructions to utilize his hands. This lack of instruction and the Bureau of Prisons' insensitivity to Mir's complaints of pain all add up to a breach of the duty of medical care owed to Mir by the Bureau of Prisons. Having found a duty from the Bureau of Prisons flowing to Mir and a breach of that duty, we must now determine whether the Bureau of Prisons' lack of medical care was a proximate cause of Mir's inability to utilize his left hand.

### 3. Proximate Cause.

■ A litigant may not prevail on a medical malpractice theory unless he establishes a direct causal link between the physician's negligence and the harm suffered. *Jones v. Montefiore Hospital,* 494 Pa. 410, 431 A.2d 920, 923–24 (1981); *Hamil v. Bashline,* 481 Pa. 256, 392 A.2d 1280 (1978). The harm is both pain and the loss of function in Mir's left lower arm, wrist and hand. Mir's injury stems from the non-use of his hand.

■ The chain of events leading to Mir's present pain and loss of function in his left arm, wrist and hand began with the slip and fall on August 31, 1980. Mir suffered pain as a result of his slip and fall. Mir's complaints of pain went unheeded by the medical staff of the Bureau of Prisons. The Bureau failed to administer adequate pain medication or instruct Mir in the need to exercise his hand. This pain led to a total disuse of his left hand and wrist. Regardless of whether Mir suffers from a carpal tunnel syndrome, a chronic pain syndrome, or simply has a low threshold for pain endurance, the fact that the pain led to disuse of his hand is clear, as is the fact that the Bureau of Prisons took no steps to attempt to alleviate the pain or instruct Mir to utilize his hand regardless of the pain. This lack of instruction on the need to exercise the hand and failure to administer pain relief is a causal link between the Bureau of Prisons' inaction and Mir's present state. The Bureau of Prisons has not shown that any other cause would have produced the injury independent of its negligence. Mir has shown that the total lack of instruction in the importance and method of exercise, continued therapy beyond that given at Springfield, and other than a paltry administration of pain relievers has greatly increased the harm to Mir. The United States argues that Mir's past and present pain and present inability to use his left wrist, hand and lower arm were caused by injury which Mir sustained sometime in 1972 while in the employ of Holiday Inn. At the time Mir entered the Allenwood Federal Prison Camp he had no complaints of pain relating to his left extremity and had full use of his left hand and wrist. This argument is without merit because, first, a defendant takes his victim as he exists at the time of the alleged tort and, secondly, one can recover for an injury regardless of whether there exists a preexisting physical or mental condition as long as one can show that malpractice was a substantial factor in bringing about the aggravation of the condition. *Boushell v. J.H. Beers,* 215 Pa.Super. 439, 258 A.2d 682 (1969); *Hamil v. Bashline,* 481 Pa. 256,

266, 392 A.2d 1280, 1285 (1978). Mir's preexisting condition is irrelevant because (1) Mir had no complaints of pain in the left hand, wrist or arm before the August 31, 1980 accident, and (2) the lack of pain killer and instruction greatly aggravated Mir's conditions and led to Mir's present inability to use his left hand, wrist and arm. If the injury Mir complains of relates to the 1972 injury, the lack of care given to Mir by the Bureau of Prisons medical staff was a very substantial factor in aggravating the condition. Mir has proven that the Bureau of Prisons' conduct amounts to malpractice.

### B. Loss of Real Property.

■ Mir alleges that he was owed a duty by the Bureau of Prisons to provide him with a phone call to his attorney so that the foreclosure proceedings on his house could be halted. The Bureau of Prisons owes a duty to prisoners under their regulations to allow phone calls. 28 C.F.R. § 540.100 states *inter alia* " ... the Warden shall permit an inmate who has not been restricted from telephone use under § 540.-103 to make at least one telephone call during each three months". Regulations and statutes can create a duty upon the persons governed by the statute or regulations such that " ... the government may be liable where its employees, in carrying out their duties failed to conform to ..." the regulations or statute. *Griffin v. United States*, 500 F.2d 1059, 1069 (3d Cir.1974). The United States argues that the Bureau of Prisons only owed Mir the duty of allowing him to make one telephone call every three months. Mir was provided more than one phone call. Mir argues that in an emergency situation such as his, the Warden has a duty not to adhere to the one phone call per three months limit. Mir reads 28 C.F.R. § 540.102 to create a duty to provide more phone calls. That provision reads:

> The Warden may not apply frequency limitations on inmate telephone calls to attorneys when the inmate demonstrates that communication with attorneys by correspondence, visiting, or normal telephone use is not adequate.

Mir did receive a phone call to his attorney, but he was informed that the attorney was not in. The United States argues that this uncompleted phone call satisfies the requirements of 28 C.F.R. § 540.100 *et seq.* We are unwilling to hold that an uncompleted phone call to an attorney satisfies the requirement of 28 C.F.R. § 540.102. By not allowing Mir at least one additional phone call after his incompleted phone call, the Bureau of Prisons was in essence applying a frequency limitation on inmate telephone calls to attorneys. Mir made it clear to the Bureau of Prisons' staff that he needed the phone calls to halt foreclosure on his home. Under the circumstances, correspondence, visiting or normal telephone use would not be adequate. Thus, the Bureau of Prisons did not comply with its regulations and breached a duty running to Mir relating to phone calls.

■ Mir asserts that the Bureau of Prisons owed a duty to him to allow John McKenzie to borrow pencil and paper from a guard and write down the name and address of Mir's attorney, relatives, and bank. Mir made this argument only in open court and not in his briefs. Mir cited no authority for this proposition and we know of none. McKenzie, who was visiting Mir as a religious advisor, was ejected for requesting a pen and paper to write down information regarding Mir's legal rather than spiritual concerns. Although we find that the Bureau of Prisons' ejectment of McKenzie for merely asking for pen and paper reprehensible, the Bureau had no legal duty to give McKenzie pen and paper or to allow McKenzie to continue his visitation with Mir. McKenzie's ejectment was overly harsh, yet the manner in which visitation privileges are granted is to be accorded great deference. *See Inmates v. Pierce*, 612 F.2d 754, 759 (3d Cir.1979). We cannot say that McKenzie's ejectment amounts to a breach of duty merely because his visit was terminated early. *Thomas v. Brierley*, 481 F.2d 660, 661 (3d Cir.1973). We shall now turn to the issue of proximate cause.

First we shall address the causal link between Mir's inability to complete a phone call to his attorney on the eve of foreclosure and the foreclosure. Mir's attorney, family and friend other than McKenzie were all aware of the foreclosure procedures. Mir's attorney was given a carbon copy of all but two letters from the bank to Mir regarding the foreclosure. Additionally, Mir testified that he had been in contact with the attorney through friends and by way of letter. Mir's nephew sent Mir a copy of a newspaper ad regarding the foreclosure. Since all the parties to whom Mir wished to place a call were aware of the foreclosure, the lack of an additional phone call was not a proximate cause of Mir's loss of real estate. Any phone call by Mir on the eve of foreclosure was not likely to be of any avail.

Second, ejectment of McKenzie was not a proximate cause of Mir's loss of real estate. It was not shown that McKenzie made any further attempts after conversation with Mir to discover the name of Mir's bank, attorney, or relatives. A telephone call to the Recorder of Deeds would have elicited the name of the Bank as first mortgagee. A call then to the Bank would have at least put McKenzie in a position to pay the amounts necessary which he testified he would have done. A call to the Bank would also have produced the name and address of Mir's attorney. Nor did McKenzie make any contact with any Bureau of Prison officials attempting to find out who these third persons were. More importantly, Mir's attorney, family, and friend other than McKenzie were already aware of the foreclosure proceedings and McKenzie's contacting them would not have changed matters.

Although there is no proximate causal connection between the Bureau's inaction and loss of Mir's property, we shall briefly discuss the defense of mitigation of damages. It appears from the record that the Bank gave Mir several extensions and opportunities to make good on his arrearages. Mir failed to do so through no fault of the Bureau of Prisons. Indeed, Mir told the bank on at least two occasions that pay-

ments were forthcoming which never materialized. Lastly, Mr. Burke, the bank president, informed Mir that he was of the opinion that the purchaser of the property would be willing to sell the property back to Mir at a slight profit but Mir made no attempt to repurchase the property. Had Mir repurchased the property, his loss would probably have been insubstantial.

IV. Conclusions of Law.

1. The medical personnel of the Bureau of Prisons were negligent in that they failed to exercise the degree of care which is usually exercised in the medical profession.

2. The negligence of the medical personnel of the Bureau of Prisons was a proximate cause of injury to Mir.

3. Actions of the Bureau of Prisons personnel were not a proximate cause of the foreclosure of Mir's property.

An appropriate order will be entered.